**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **JOHN LEWIS,** | |
| **Plaintiff,** | **CIVIL ACTION FILE NO. 1:22-cv-01806-TWT** |
| **v.** | |
| **PAUL MEDFORD, QUEST LINER, INC., MCCOY GROUP, INC. AND ACE AMERICAN INSURANCE COMPANY,** | |
| **Defendants.** | |

## <u>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

COME NOW, Defendants **PAUL MEDFORD, QUEST LINER, INC., MCCOY GROUP, INC. AND ACE AMERICAN INSURANCE COMPANY** (hereinafter, "Defendants") in the above-styled civil action and hereby files this, their Brief in Support of their Motion for Summary Judgment, showing this Honorable Court as follows:

## PRELIMINARY STATEMENT

This is an action for personal injury damages arising out of a motor vehicle collision that occurred on January 4, 2021. The accident was captured on video. Therefore, the material facts of this incident are undisputed.

As shown in the video, Plaintiff was driving a tow truck with flashing amber lights and his hazard flashers activated. Plaintiff merged in front of Defendant Medford onto I-20 Eastbound. Defendant Medford slowed down to create a reasonably safe distance between himself and Plaintiff. At some point, Plaintiff turned off his hazard flashers. Approximately 25 seconds after Plaintiff merged in front of Mr. Medford, suddenly, and without warning, Plaintiff drastically reduces his speed below the speed limit in an attempt to pullover onto the right shoulder of I-20 to pick up a disabled vehicle. As a result of Plaintiff's unwarranted and unforeseen hard brake, Mr. Medford rear-ended Plaintiff's tow truck.

All of the criticisms by Plaintiff require this Court to hold Mr. Medford to an extraordinary standard of care. An extraordinary standard of care which would have required Mr. Medford to foresee, with no prior warning or indication, Plaintiff ***creating an unnecessary hazard*** on the road with only ***2.2 seconds to react***. Given Plaintiff's reckless disregard for his actions in causing this accident, Defendants respectfully request that this Court dismiss this case with prejudice.

## STATEMENT OF FACTS

### I.    The Subject Accident and Allegations

Plaintiff's suit is premised on an accident that occurred on January 4, 2021. [Amended Compl., Doc. 6, ¶¶ 1, 40]. Plaintiff was operating a tow truck and was on his way to pick up a disabled vehicle on the shoulder of I-20 Eastbound. *Id*. at ¶ 42. In his Complaint, Plaintiff alleges that Mr. Medford did not slow or stop, and collided with Plaintiff's vehicle. *Id*. at ¶ 43. Specifically, Plaintiff alleges that Mr. Medford failed to keep a proper look out, keep a safe distance, timely apply his brakes, and drive at a reasonably prudent speed under conditions. *Id*. at ¶¶ 57-61. Plaintiff also alleges Mr. Medford was negligent *per se* for violating various traffic laws. *Id*. at ¶ 62. Plaintiff further imputes these allegations against Quest Liner and/or McCoy Group pursuant to the doctrine of *respondeat superior*. *Id*. at ¶ 72.

Plaintiff is also alleging independent negligence against Quest Liner and McCoy Group for negligently hiring, training, and supervising Mr. Medford, along with negligently entrusting the subject tractor-trailer to Mr. Medford. *Id*. at ¶¶ 74-77. Lastly, Plaintiff is requesting punitive damages, alleging that Defendants acts were knowing, willful, wanton, and/or demonstrated that entire want of care, which raises the presumption of a conscious indifference to consequences. *Id*. at ¶¶ 93-94.

### II.    Plaintiff's Deposition Testimony

Plaintiff is an experienced tow truck driver with over a decade of experience. Lewis Depo., at 28:11-20, attached hereto as Exhibit "A". On the day of the accident, Plaintiff was working within the scope of his employment and on his way to pick up a disabled vehicle:

> Q: What was the purpose of your trip on the day of the accident?
> **A: Going to pick up a disabled vehicle.**

*Id*. at 31:25, 32:1-2. Plaintiff recalls the accident occurring in the following manner:

> Q: Tell me a little bit about, kind of in your own words, how the accident happened.
> **A: I was headed to one of my calls that I had in my Towbook, which was on I-20 … As I was driving down 20, I started spotting a black vehicle, which in my Towbook, it shows the color of the car.**
> **…**
> **A: And as I was approaching closer, I see that it is a Hyundai, so I started slowing down, putting my lights on and the – the car was on the shoulder of the road … And I was approaching the car, I was slowing down, getting ready to get over on the shoulder of the road, and I never made it. I got hit from behind. I never made it to the shoulder of the road.**

*Id*. at 32:15-25, 33-1-12. Plaintiff then clarified what he meant by "putting [his] lights on":

> Q: You say you put your lights on. What do you mean by that?
> **A: My beacon light, the lights on the top of my tow truck.**

*Id*. at 33:15-18. Plaintiff then incorrectly stated the designated meaning of his flashing amber lights *and* when he activated them:

Q: What did those lights mean?
**A: It means safety.**
Q: Okay.
**A: It means giving the other driver awareness, you know, that you're there, that something is, you know, slowing down, you know, that's what it means.**
Q: Did you have those lights on the entire trip, or did you turn them on somewhere during the trip?
**A: No, I turned them on approaching my vehicle.**

*Id*. at 33:19-25, 34:1-5. Furthermore, Plaintiff testified that he did not turn on his right turn blinker to indicate that he would be turning onto the shoulder lane:

Q: But there is no light indicating that you are making a right turn – or not a turn, but you're making
**A: Getting ready to get over.**
Q: Getting ready to go over. Would that be accurate?
**A: From what I see, I don't see a light blinking, indicating that I want to go to the right or get over or anything like that.**
Q: Do you have any independent recollection of you actually turning on the blinker to indicate –
**A: Not that I can recall.**
Q: So if we take that and look at the video, can we agree that the blinker was not on?
**A: From what we see, we can agree.**

*Id*. at 44:8-25. Additionally, Plaintiff testified that prior to the accident, he slowed down to less than the speed of traffic so he could look for the vehicle, and once he saw the vehicle, he slowed down even more:

Q: So you were going kind of slower than what the speed of traffic was?
**A: Yeah, because I'm looking for something.**
Q: And then once you saw the vehicle, you kind of –
**A: Even slowed down even more.**

*Id*. at 45:22-25, 46:1-2. In sum, Plaintiff testified that he merged in front of Mr. Medford to look for a disabled vehicle on the road for him to tow. Plaintiff incorrectly presumed that because he had his top flashing amber lights (or "beacon lights") activated, that other drivers should be on alert for him to stop at any moment. Lastly, and most importantly, Plaintiff admitted that he did not turn on his right turn blinker to indicate that he would be merging onto the right shoulder. Instead, Plaintiff just abruptly stopped because he spotted the vehicle he was assigned to tow.

### III.   <u>Defendants' Experts</u>

#### a.   <u>Opinions of Mr. Sean Alexander, Defendants' Accident Reconstruction Expert</u>

As a preliminary matter, Plaintiff has not brought forth any expert witnesses who are expected to testify regarding the dynamics of the accident, timing, speed, and vehicle movements. Discovery in this matter has closed. Defendants disclosed Sean Alexander ("Mr. Alexander") as an accident reconstructionist expert. [Doc. 61]. In his report, Mr. Alexander provided a detailed analysis of the subject-accident, along with his factual findings in the moments leading up to it. [Doc. 61-1]. In his deposition, Mr. Alexander explained his opinions and findings. *See* Ex. "B".

Mr. Medford's dashcam video starts as Plaintiff's tow truck merges onto I-20 East in front of Mr. Medford's tractor-trailer. *Id*. at 5. Plaintiff's tow truck merged in front of Mr. Medford with the top flashing amber lights and rear hazard lights

already activated. *Id*. After merging in front of Mr. Medford, Plaintiff's rear hazard lights are deactivated. *Id*. The impact occurred 25.09 seconds after Plaintiff merged in front of Mr. Medford. *Id*. at 12.

Per Mr. Alexander's analysis, both Plaintiff and Mr. Medford were traveling around 55 miles per hour ("mph"). *Id*. The vehicles then slowed down to approximately 47-50 mph. *Id*. Plaintiff continues to slow down, but not by activating his brakes. *Id*. Rather, Plaintiff seems to have removed his foot from the gas pedal, causing a gap closure seconds before the accident. *Id*. 2.2 seconds before the accident occurred, Plaintiff applied his brakes, drastically reducing his speed. *Id*. After 25.09 seconds of driving in front of Mr. Medford, and without providing a single indication that he was going to make an abrupt stop, Plaintiff slammed on his brakes in the travel lane of I-20, because he wanted to pick up the disabled vehicle on the right shoulder. Alexander Depo., at 21:4-20; Doc. 61-1 at 12.

In total, Mr. Medford only had 2.2 seconds to react from the time Plaintiff's brake lights were first activated. *Id*. According to Mr. Alexander's analysis, it would have taken Mr. Medford four and a half seconds to bring his tractor-trailer to a complete stop:

> Q: So traveling at 50 miles an hour, from the point in time that the brake is applied, it's going to take him close to 2 seconds to bring that vehicle to a stop. Would that be fair or unfair?

**A: It would take him longer than 2. Let me see how long it would take him. Because, remember, you're slowing down. You're not covering the same distance at the same speed, so.**

Q: Fair enough.

**A: It would take him 4.14 seconds once – and plus brake lags, you've got another .25 to about .42 seconds on there. So about 4 and a half seconds once you hit the brakes to stop, and during that time you're slowing down.**

Alexander Depo., at 28:5-19. As such, Mr. Alexander opined that it would have taken 4.5 seconds for Mr. Medford to bring his tractor-trailer to a complete stop in the travel lane of I-20 with only 2.2 seconds of warning from the time Plaintiff initiated his hard stop. Had Plaintiff been reasonable in his foresight, he would have merged into the shoulder after passing the disabled vehicle and then backed up to retrieve the vehicle. *Id*. at 21:4-20.

## b. <u>Opinions of Ms. Stephanie Borzendowski, Defendants' Human Factors Expert</u>

Plaintiff has not brought forth any expert witnesses who are expected to testify regarding any area of human factors. Defendants disclosed Ms. Stephanie Borzendowski ("Ms. Borzendowski") as an expert in the area of human factors. [Doc. 72]. She is expected to testify regarding Plaintiff's abrupt braking and how it created an unavoidable hazard for Mr. Medford. *Id*.

With respect to the current understanding of human factors, Ms. Borzendowski testified that it takes the human eye 1.2 to 1.4 seconds to perceive a hazard:

> Q: Whatever his following distance is behind Mr. Lewis, you have to subtract 1.2 to 1.4 seconds from that as it relates to when he'll actually begin responding to whatever the stimuli is, correct?
> **A: I think the cleaner way for me to frame it is to say that because it – the perception response time clock starts with the detection of a hazard. Then the following distance isn't really relevant in that context. What we're really concerned with is when is the onset of the hazard, when is the hazard first detectable. And then that interval is what you're subtracting 1.2 to 1.4 from to determine how much time is left for whatever maneuver is selected as the response.**

Borzendowski Depo., at 14:21-25, 15:1-9, attached hereto as Exhibit "C". In her report, Ms. Borzendowski opines that "[w]hile Lewis braked and brake lights were visible in the dash cam video, the tow truck did not significantly reduce its speed until less than a second before the collision." [Doc 72-1 at 3]. Furthermore, Ms. Borzendowski determined that Plaintiff's failure to use his right turn indicator ***significantly contributed*** to the accident as it would have put Mr. Medford on notice to anticipate that Plaintiff would be strongly decelerating to turn at a comfortable speed. *Id* at 4.

In her conclusion, Ms. Borzendowski determined that Plaintiff's unexpected abrupt braking created an *unavoidable hazard* for Mr. Medford. *Id*. (emphasis added). When read in conjunction with Mr. Alexander's opinions, it is apparent that

Plaintiff's actions did not afford Mr. Medford any time to stop his vehicle. Recall, Mr. Alexander stated that only 2.2 seconds elapsed from the time Plaintiff drastically applied his brakes to the subject accident's occurrence, along with 4.5 seconds to fully stop the vehicle. [Doc. 61-1 at 12]. Per Ms. Borzendowski's report and testimony, it would have taken Mr. Medford 1.2 to 1.4 seconds to perceive the hazard Plaintiff created. Through the use of simple arithmetic, it is evident that Mr. Medford could not have avoided the accident, and that this accident was unavoidable. Borzendowski Depo., at 55:7-12; Doc. 72-1 at 4.

## IV.    Plaintiff' Purported Trucking Expert

Plaintiff disclosed Mr. Adam Grill ("Mr. Grill"), a purported trucking safety expert. In his report, Mr. Grill properly states the appropriate standard of care for truck drivers, which is ordinary care. *Id*. at 8. However, Mr. Grill attempts to elevate the standard of care by stating there are different "performance standards" for truck drivers which are necessary to reach the standard of care. *Id*.

Mr. Grill's expected testimony regarding Mr. Medford's operating performance is based entirely on personal standards and definitions he created:

> Q: What is a performance standard?
> **A: Performance standard is a term *I* use to define the set of knowledge and skills required to specifically carry out whatever reasonable duty is being undertaken. So in my area of expertise, that would be the operation of a truck.**

Grill Depo., at 60:25, 61:1-9. (emphasis added). Mr. Grill then goes on to provide his interpretations of the Federal Motor Carrier Safety Regulations ("FMCSRs"), as if he is the arbiter of FMCSR interpretation:

> Q: What does safe driving performance mean?
> **A: It means the knowledge and skills necessary to operate our vehicle in a way that is safe and does not endanger other road users.**
> Q: Is safe driving performance required under the FMCSRs, or the definition that you provided to me, is it required under the FMCSRs?
> **A: No, that definition does not exist in the FMCSRs.**
> …
> Q: So in which way then is Mr. Medford required to follow defensive driving standards?
> **A: He's required to operate his vehicle safety and reasonably in a manner that does not cause or contribute to an accident. And inherit in accomplishing that mission is to operate our vehicle defensively according to the standards that are developed and utilized in the industry.**
> Q: Show me where that is listed in the Federal Motor Carrier Safety Regulations.
> **A: That's my definition. Again, the regulations don't use the term "defensive driving standards."**

*Id*. at 70:17-25, 71:1; 75:11-25, 76:1-4. Mr. Grill then goes on to opine that Mr. Medford was a qualified driver and Quest did not negligently hire him:

> Q: I wanted to ask you, do you have any opinions or issues with Quest's selection of Mr. Medford as a driver?
> **A: Not necessarily, no. I wouldn't select him, but there's not specific in his background that prohibits a company from selecting and using him.**
> …
> Q: So it is your opinion that you personally wouldn't select him, but as far as industry standards, he was properly selected as a driver?

-11-

**A: Again, I wouldn't necessarily use the term "properly", but, yeah, there was, there was nothing prohibiting a company from utilizing him, no.**

*Id*. at 80:20-25, 81:1; 81:9-14. Apart from Mr. Grill's biased determination regarding his feelings towards the hiring of Mr. Medford, Mr. Grill testified that Quest Liner appropriately hired Mr. Medford, a qualified driver. *Id*.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   Summary Judgment Standard

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Whetstone Candy Co. v. Kraft Foods, Inc*., 351 F.3d 1067, 1073 (11th Cir. 2003). A fact is not material if a dispute over that fact will not affect the outcome of the legal issue before the court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the trial court is to view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp*., 277 F.3d 1294, 1296 (11th Cir. 2002).  However, "[w]here the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v.
Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

Once Defendant has discharged its burden of demonstrating that there is an
absence of evidence to support the essential elements of Plaintiff's case, Plaintiff
must present evidence to establish a genuine issue of material fact on each of the
essential elements of her claims (i.e., duty, breach, causation, and damages). In so
doing, argument is insufficient, and Plaintiff must go beyond the pleadings and
submit evidence sufficient to demonstrate that a jury could reasonably find by a
preponderance of the evidence that she is entitled to a verdict in her favor. *Caltex
Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### a. <u>There is No Evidence That Mr. Medford's Actions Fell Below the Applicable Standard of Care and thus, There is No Breach of Duty</u>

"Negligence is predicated on what should be anticipated, rather than on what
happened, because one is not bound to anticipate or foresee and provide against what
is unlikely, remote, slightly probable, or slightly possible." *Amos v. City of Butler*, 242
Ga. App. 505, 506, 529 S.E.2d 420 (2000).  A defendant is not required to "anticipate
exactly what will happen and exercise perfect judgment to prevent injury." *Wilkerson
v. Alexander*, 208 Ga. App. 83, 85, 429 S.E.2d 685 (1993). A defendant is only required
to anticipate "what the reasonably prudent person would have foreseen as likely to

happen…." *Id.* "***Negligence is predicated on faulty or defective foresight rather than on hindsight which reveals a mistake***." *Id.* (emphasis added).

Here, there was no warning or indication which Mr. Medford could have reasonably foreseen to anticipate that Plaintiff would abruptly stop in the travel lane of I-20. At all times material, Plaintiff was driving with his amber lights on. In addition to having his amber lights on, which has no significance on a *moving* vehicle, Plaintiff *deactivated* his flashers, further dispelling any potential indication that Plaintiff would abruptly stop. O.C.G.A. § 40-6-14. Lastly, Plaintiff did not activate his right turn indicator to indicate his intentions of turning onto the shoulder. Putting all the obvious lack of indications aside, there is still no reason for Mr. Medford to anticipate that Plaintiff would abruptly stop his tow truck to below the posted minimum speed in 2.2 seconds. Additionally, Plaintiff was negligent in that he acted with faulty *and* defective foresight in choosing to abruptly stop rather than maintaining a reasonable speed, using his indicator, and merging onto the shoulder to retrieve the vehicle, as suggested by Mr. Alexander. Alexander Depo., at 21:9-20.

Plaintiff will argue that the flashing amber lights on the top of his tow truck should have put Mr. Medford on notice of Plaintiff's intentions. However, O.C.G.A. § 40-6-14, commonly referred to as the "Move Over Law", provides that the flashing amber lights only provide notice to other drivers for **stationary towing or recovery**

**vehicles**. (emphasis added). Plaintiff was not a stationary vehicle. Furthermore, Plaintiff's continued usage of the flashing amber lights from the moment the video started until the accident only serve to disprove any claim of Plaintiff being a hazard. Borzendowski Depo., at 53:4-13.

"There is no absolute duty on a driver to avoid a collision; rather, all drivers are charged with the duty to exercise ordinary care under the circumstances." *Rios v. Norsworthy*, 266 Ga. App. 469, 470, 597 S.E.2d 421, 424 (2004). Here, Plaintiff violated his duty to exercise ordinary care. Plaintiff owed a duty to Mr. Medford to drive as a reasonably prudent person would. O.C.G.A. § 40-6-123 requires a "signal of intention to turn right or left or change lanes when required shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction…" Mr. Medford was in the class of people to be protected by O.C.G.A. § 40-6-123 since he was driving in the same direction behind Plaintiff. As such, Plaintiff's negligence *per se* was the causal nexus of the subject-accident, not Mr. Medford's operation of his tractor-trailer.

"Where the duty is that of ordinary care, one is not negligent (or contributorily negligent) merely because of failure to exercise that degree of care which would have absolutely prevented injury." *Seagraves v. ABCO Mfg. Co.*, 118 Ga.App. 414, 419, 164 S.E.2d 242 (1968).

> One who is himself rightfully using the highway or street has a right to the use thereof, which is superior to that of one who is violating traffic regulations, and, in the absence of knowledge, **he is not required to anticipate that some other user will unexpectedly violate the law or rule of the road and create a situation of danger.**

*Rios v. Norsworthy*, 266 Ga. App. 469, 470, 597 S.E.2d 421, 424 (2004) (emphasis added). The facts of the accident in *Rios* are different from those in the case at bar, but the ultimate issue is the same, namely that the plaintiff tried to establish a higher standard of care for tractor-trailer drivers than that prescribed under the law.

The Georgia Court of Appeals in *Rios* held that, "where a driver rightfully using the road and exercising ordinary care fails to discover and avoid the dangerous consequences of another driver's unexpected traffic violation, he is not negligent merely because he would have discovered and avoided those consequences if he had employed a heightened degree of care." *Id.* The standard of care applicable to Mr. Medford is found in the Georgia Rules of the Road – not the testimony of Plaintiff's experts who opine that Mr. Medford failed to meet an arbitrary and self-created "performance standard".

This issue was directly addressed by the Court of Appeals of Georgia in the *Rios* opinion. In that case, the plaintiff tried to support his argument that the defendant was negligent with testimony of "trucking safety experts" but the Court

held that such testimony was not admissible to preclude the grant of summary judgment. *Id.* at 473. The Court of Appeals explained:

> First, the relevant standard of care [is] the duty to exercise ordinary care under the circumstances. Where the duty is that of ordinary care, [the defendant] cannot be found negligent merely because he could have prevented the collision if he had exercised a heightened degree of care. Second, expert opinion evidence is not admissible where the matter under consideration—whether [the defendant] exercised ordinary care to discover and avoid the collision—is not shrouded in the mystery of professional skill and beyond the ken of the average layman.

*Id.* The criticisms of the defendant in the *Rios* case were similar to those raised by the Plaintiff here against Mr. Medford in that they held a tractor-trailer driver to a higher standard of care than should have been applied.

Here, the analysis is an easy one. There is only one hypothetical scenario proposed by Plaintiff in which the accident could have been avoided: Mr. Medford would be required to drastically reduce his speed under the posted minimum when there was no evidence to suggest that Plaintiff would abruptly stop his vehicle in the travel lane. Plaintiff's improper hindsight analysis requires Mr. Medford to have broken the law based on the inconceivable idea that Plaintiff would create an illogical and unnecessary hazard.

It is undisputed that Mr. Medford was traveling under the maximum speed limit. It is undisputed that Mr. Medford was traveling in a lane that he was allowed to occupy. It is undisputed that he was increasing his following distance behind

Plaintiff. It is undisputed that Plaintiff did not utilize his right turn indicator to indicate his intentions of changing lanes, as required by Georgia law. It is undisputed that Mr. Medford was paying attention to the road ahead of him and reacted quickly to everything that happened. It is undisputed that Plaintiff abruptly slowed down in front of Mr. Medford and that the speed of Plaintiff's vehicle fell below 45 miles per hour, which is the minimum allowable speed on the interstate. The average human perception time for a discovered hazard and the time required for Mr. Medford to stop his tractor-trailer were not sufficient to account for the abrupt hazard Plaintiff created by his own negligent acts. Ultimately, there is no evidence in the record that shows Mr. Medford knew or in the exercise of ordinary care should have known about and avoided the hazard created by Plaintiff.

### b. **Plaintiff's Independent Negligence Claims Against Quest Liner[1] Fail as a Matter of Law**

Under Georgia law, an employer may only be held liable for the acts and omissions of its employee under certain circumstances. To establish liability for negligent hiring, supervision, and retention, the law requires a plaintiff to demonstrate that "[a]n employer breaches its duty of care by hiring an employee

---

[1] Defendants' clarify that Quest Liner is a subsidiary of McCoy Group and that the independent negligence claims discussed below are to be considered as referring to both Defendants.

'who is not accustomed to act with due care.' The causation element requires showing that, given the employee's dangerous propensities, the victim's injuries should have been foreseen as the natural and probable consequence of hiring the employee." *TGM Ashley Lakes, Inc. v. Jennings*, 264 Ga. App. 456, 459, 590 S.E.2d 807 (2003). An employer "is bound to exercise ordinary case in the selection of employees and not to retain them after knowledge of incompetency." O.C.G.A. § 34-7-20. An employer is only liable for negligently hiring or retaining an employee when the employer knows or in the course of ordinary care should have known the employee was not suited for that particular employment. *Harvey Freeman & Sons, Inc. v. Stanley*, 259 Ga. 233, 378 S.E.2d 857 (1989); *Western Industries, Inc. v. Poole*, 280 Ga. App. 378, 381 (2006); *Patterson v. Southeastern Newspapers*, 243 Ga. App. 241, 245 (2000); *C.K. Sec. Systems, Inc. v. Hartford Ac. & Indem. Co.*, 137 Ga. App. 159, 161 (1976).  With regard to summary judgment,

> [a]n employer has a duty to exercise "ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable" that the employee's tendencies could cause the type of harm sustained by the plaintiff . . . **In order to defeat summary judgment on this issue, a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.**

> *Remediation Res., Inc. v. Balding*, 281 Ga. App. 31, 34 (2006) (emphasis added and internal citations omitted). "[A]bsent a causal connection between the employee's

particular incompetency for the job and the injury sustained by the plaintiff, the defendant employer is not liable to the plaintiff for hiring an employee with that particular incompetency." *Munroe v. Universal Health Servs, Inc.*, 277 Ga. 861, 862 (2004). "Consonant with general tort principles . . . an employer may be held liable only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's 'tendencies' to engage in certain behavior relevant to the injuries incurred by the plaintiff." *Munroe*, 277 Ga. at 862. In order for a plaintiff to recover under theories for negligent training and supervision "[t]here must be a causal link between the alleged breach of duty and the injury caused." *La Petite Academy, Inc. v. Turner*, 247 Ga. App. 360, 362 (2000).

"Negligent hiring and retention are closely related, separated only by when the employer becomes aware of the information that amounts to reasonable notice of the employee's incompetence. If the employer discovers the employee's incompetence after hiring, the retention becomes the negligent act." *ABM Aviation v. Prince*, 366 Ga. App. 592, 597 (2023). "[T]o defeat summary judgment on an issue of negligent supervision, a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue." *Id.* (*citing Remediation Resources v. Balding*, 281 Ga. App. 31, 34 (2006)). "An employer may be held liable for negligent supervision *only* where there is sufficient evidence to

establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff." *Leo v. Waffle House*, 298 Ga. App. 838, 841 (2009) (emphasis added); *see also Rogers v. Bon Appetit Mgmt. Co.,* No. 1:22-CV-01442-JPB, 2023 U.S. Dist. LEXIS 123926 at *7 (July 19, 2023).

### i.  <u>Negligent Hiring Claims</u>

Here, Plaintiff has not, and cannot, produce *any* evidence of incidents similar to the behavior that was the cause of Plaintiff's alleged injuries at issue. As Plaintiff's own expert testified, there was no issue with Quest Liner's hiring of Mr. Medford as he was a qualified driver. Prior to being hired by Quest Liner, Mr. Medford had (1) a valid CDL; (2) zero traffic citations; and (3) zero accidents in the prior 7 years. *See* Exhibits "F" and "G". There is absolutely zero evidence to demonstrate that Quest Liner "knew or should have known" of Mr. Medford's "tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff" because he had no such tendencies. *See Leo v. Waffle House*, 298 Ga. App. 838, 841 (2009). As such, Plaintiff's claim for negligent hiring, and same should be dismissed accordingly.

### ii.  <u>Negligent Training and Supervision Claims</u>

As noted above, negligent hiring and supervision claims are similar insofar as "a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue." *ABM Aviation v. Prince*, 366 Ga. App. 592, 597 (2023). "If the employer discovers the employee's incompetence after hiring, the retention becomes the negligent act." *ABM Aviation*, 366 Ga. App. at 597. Prior to the subject accident, in the past 9 years, Mr. Medford was involved in 3 accidents, all while he was stopped/parked. *See* Ex. "H", ¶ 16; *see also* Medford Depo., at 48-51. As such, Plaintiff cannot show that Mr. Medford was incompetent or produce any evidence of incidents similar to the behavior that was the cause of Plaintiff's injuries because there is simply no evidence to support such a claim.

It is unclear what training Plaintiff claims was deficient or negligently performed. When Quest Liner hired Mr. Medford, he was required to complete road tests, along with various training programs. *See* Ex. "I". Furthermore, Plaintiff underwent quarterly training programs provided by Quest Liner. *See* Medford Depo., at 42-45. The subject accident occurred not because Mr. Medford was "improperly trained", but because Plaintiff elected to violate the rules of the road by abruptly stopping in the travel lane. Accordingly, Plaintiff's claim for negligent training should be dismissed.

### iii.  <u>Negligent Entrustment Claims</u>

"In the case of negligent entrustment of a vehicle by an employer to an employee, liability is predicated 'on a negligent act of the owner in lending his vehicle to another to drive, with actual knowledge that the driver is incompetent or habitually reckless.'" *Quynn v. Hulsey*, 310 Ga. 473, 477 (2020) (*quoting CGL Facility Mgmt. v. Wiley*, 328 Ga. App. 727, 731 (2014)).

There is absolutely no evidence showing, or even suggesting, that Mr. Medford was "incompetent or habitually reckless". Moreover, Georgia law requires that the employer have *actual knowledge* of such behavior. Even if Plaintiff could demonstrate that Mr. Medford was incompetent or habitually reckless—which he cannot—he cannot demonstrate that Quest Liner had actual knowledge of such characteristics. At the summary judgment stage, Plaintiff must point to evidence, not merely the baseless allegations in his Complaint. Plaintiff cannot identify any evidence sufficient to support a negligent entrustment claim, and this claim should be dismissed.

### c. Plaintiff's Claims for Punitive Damages and Attorney's Fees Must Fail as a Matter of Law

There is *no* evidence, much less clear and convincing evidence, that the facts of this accident would support Plaintiff's claim for punitive damages. Plaintiff's Complaint does not state any specific act or omission to act by either Mr. Medford or Quest Liner which would warrant the imposition of punitive damages. "Clear and

convincing evidence of a defendant's 'willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences' is required to warrant the imposition of punitive damages. *Bartija v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 218 Ga. App. 815, 463 S.E.2d 358 (1995), citing O.C.G.A. § 51-12-5.1(b). "Negligence, even gross negligence, is insufficient to support such an award. *Id*.; *see also Brooks v.* Gray, 262 Ga. App. 232, 232-233 (1) (585 SE2d 188) (2003) (crossing centerline and operating vehicle without a proper license did not warrant imposition of punitive damages); *Miller v.* Crumbley, 249 Ga. App. 403, 405 (548 SE2d 657) (2001) (no evidence of pattern or policy of dangerous driving where tortfeasor failed to keep a proper lookout and pled guilty to following too closely). Compare *Langlois v. Wolford*, 246 Ga. App. 209, 210 (1) (539 SE2d 565) (2000) (punitive damages authorized where tortfeasor left the scene of an accident, was intoxicated, and had a history of prior DUIs and traffic violations).

Here, as discussed above, there are no facts that Mr. Medford had a pattern or policy of dangerous driving, or that any Defendant acted with of the required elements for punitive damages. As such, Plaintiff's claim for punitive damages must fail as a matter of law.

Lastly, Plaintiff's claims for attorney's fees must fail as a matter of law since, as shown above, there is a *bona fide* dispute regarding a plethora of Plaintiff's allegations. "In a case where bad faith is not an issue, attorney's fees are not authorized under O.C.G.A. § 13-6-11 if the evidence shows that a genuine dispute exists-whether of law or fact, on liability or amount of damages, or on any comparable issue." *Brown v. Baker*, 197 Ga. App. 466, 468, 398 S.E.2d 797 (1990) (internal citations omitted). A *bona fide* controversy exists if there is some conflict in the evidence, even if it arises from the Defendant's own testimony. *Anderson v. Cayes*, 278 Ga. App. 592, 630 S.E.2d 441 (2006). There is a genuine dispute on liability, causation, and amount of damages in this case. As such, Plaintiff's claim must fail as a matter of law.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Defendants respectfully request that this Court grant this Motion for Summary Judgment as to all of Plaintiff's claims.

This <u>30th</u> day of September, 2024.

365 Northridge Road, Suite 230
Atlanta, Georgia 30350
Phone: (770) 650-8737
Fax: (770) 650-8797
scott.moulton@qpwblaw.com
sandro.stojanovic@qpwblaw.com
foss.baker@qpwblaw.com

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

*/s/ Sandro Stojanovic*
SCOTT H. MOULTON
Georgia State Bar No. 974237
SANDRO STOJANOVIC
Georgia State Bar No. 473114

gabriel.logreira@qpwblaw.com                FOSS BAKER
                                            Georgia State Bar No. 296402
                                            GABRIEL A. LOGREIRA
                                            Georgia State Bar No. 881117

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **JOHN LEWIS,** | |
| **Plaintiff,** | **CIVIL ACTION FILE NO.** **1:22-cv-01806-TWT** |
| **v.** | |
| **PAUL MEDFORD, QUEST LINER, INC., MCCOY GROUP, INC. AND ACE AMERICAN INSURANCE COMPANY,** | |
| **Defendants.** | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I have served a copy of the within and foregoing **<u>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>** upon all parties to this matter by depositing a true copy of same in the U.S. Mail, proper postage prepaid, addressed to counsel of record as follows and/or filing said document with the CM/ECF system which will automatically send electronic notification to the following:

Adewale Odetunde
WLG Atlanta LLC
600 Peachtree Street NE
Suite 4010
Atlanta, GA 30308

Adewale.odetunde@witheritelaw.com
*Counsel for Plaintiff*

This <u>30th</u> day of September, 2024.

365 Northridge Road, Suite 230
Atlanta, Georgia 30350
Phone: (770) 650-8737
Fax: (770) 650-8797
scott.moulton@qpwblaw.com
sandro.stojanovic@qpwblaw.com
foss.baker@qpwblaw.com
gabriel.logreira@qpwblaw.com

**QUINTAIROS, PRIETO, WOOD & BOYER, P.A.**

*/s/ Sandro Stojanovic*
SCOTT H. MOULTON
Georgia State Bar No. 974237
SANDRO STOJANOVIC
Georgia State Bar No. 473114
FOSS BAKER
Georgia State Bar No. 296402
GABRIEL A. LOGREIRA
Georgia State Bar No. 881117